### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

STEPHANIE G.,[1]

    Plaintiff,

v.                                                                      Case No. 22-cv-00904-RMM

MARTIN O'MALLEY,[2]
Commissioner of Social Security,

    Defendant.

### MEMORANDUM OPINION AND ORDER

Plaintiff Stephanie G. brought this action under a provision of the Social Security Act, 42

U.S.C. § 405(g), seeking review of the Commissioner of Social Security's decision to deny her

claim for Social Security Disability Insurance and Supplemental Security Income benefits.  With

the parties' consent, the matter was referred to the undersigned for all purposes.  *See* Notice of

Consent, ECF No. 9; Order, ECF No. 16.  Now pending are Ms. G.'s Motion for Judgment of

Reversal, ECF No. 11, and the Commissioner's Motion for Judgment of Affirmance, ECF No.

13.  Having reviewed the Administrative Record,[3] the parties' briefs,[4] and the relevant law, the

Court DENIES Ms. G.'s Motion for Judgment of Reversal.

---

[1] Plaintiff's name has been partially redacted in keeping with the recommendation of the
Committee on Court Administration and Case Management of the Judicial Conference of the
United States.  *See* Mem. from Hon. Wm. Terrell Hodges, Chair, Comm. on Ct. Admin. & Case
Mgmt., to Chief Judges of the U.S. Cts. of Appeals et al. (May 1, 2018), available at
https://www.uscourts.gov/sites/default/files/18-ap-c-suggestion_cacm_0.pdf.
[2] Martin O'Malley became Commissioner of Social Security on December 20, 2023.
Pursuant to Federal Rule of Civil Procedure 25(d) and the last sentence of 42 U.S.C. § 405(g),
Mr. O'Malley is substituted for Kilolo Kijakazi as the Defendant in this case.
[3] Page citations to the Administrative Record, ECF No. 6 ("AR"), refer to the running
pagination at the lower right margin.
[4] The relevant briefs are Ms. G.'s Motion for Judgment of Reversal, ECF No. 11 ("Pl.'s
Mem."); the Commissioner's Memorandum in Support of his Motion for Judgment of

## BACKGROUND

Ms. G. applied for Social Security Disability Insurance and Supplemental Security Income benefits on November 7, 2019, when she was 59 years old.  *See* AR 60–72, 75.  Her disability claim is based on a combination of physical impairments including fibromyalgia, migraines, spine disorders, and traumatic brain injury.  *See* AR 67.  In her application for benefits, she alleged the following illnesses, injuries, and conditions: concussion; migraines; myalgia and fibromyalgia; raised antibody titer; neck, shoulder, and back pain; chronic fatigue; sensitivity to light; and numbness in the right arm.  *See* AR 60–61.  Ms. G. claims her disability began on November 7, 2019.  *See* AR 15.

Ms. G.'s application for benefits was denied at both the initial and reconsideration levels of review.  *See* AR 1–14.  She requested a hearing before an Administrative Law Judge ("ALJ"), which was held on August 6, 2021.  *See* AR 144.  On August 20, 2021, the ALJ denied Ms. G.'s application for benefits.  *See* AR 15–27.  The Appeals Council denied Ms. G.'s request for review of the ALJ's decision on March 17, 2022.  *See* AR 1.  The ALJ's decision therefore constitutes the Commissioner's final decision, which Ms. G. has asked this Court to reverse, or alternatively remand for further hearings pursuant to 42 U.S.C. § 405(g).  *See* Pl.'s Mem. at 1.  The Social Security Administration (SSA) filed a cross-motion asking that the Court affirm the decision.  *See* Def.'s Mem. at 1.

## I.   Legal Framework

To qualify for benefits under the Social Security Act, a claimant must demonstrate a disability that renders her unable to "engage in any substantial gainful activity by reason of any

---

Affirmance and in Opposition to Ms. G.'s Motion, ECF No. 13 ("Def.'s Mem."); and Ms. G.'s Reply in Support of her Motion and in Opposition to the Commissioner's Motion, ECF No. 15 ("Pl.'s Reply").

medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(a), 423(d)(1)(A), 1382(a)(1), 1382(a)(3)(A).

The Commissioner uses a five-step process to determine whether a claimant is disabled under the Act. *See* 20 C.F.R. §§ 404.1520, 416.920; *see also Butler v. Barnhart*, 353 F.3d 992, 997 (D.C. Cir. 2004) (describing each step). At step one, the claimant must show she is not engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step two, she must show she has a "severe medically determinable physical or mental impairment" or combination of impairments. *Id*. § 404.1520(a)(4), 416.920(a)(4). At step three, the Commissioner must determine whether the claimant's impairment or impairments meet or equal an entry in the Commissioner's Listings maintained at 20 C.F.R. part 404, subpart P, appendix 1. The Listings describe impairments that the Commissioner considers disabling without regard to a claimant's age, education, or work experience. *Id.* §§ 404.1520(d), 416.920(d). If the claimant's impairment is listed, or if her impairments together equal an impairment in the Listings, the Commissioner will conclude that the individual is disabled and end her inquiry. *Id.*; *see also Petty v. Colvin*, 204 F. Supp. 3d 196, 200 (D.D.C. 2016).

A claimant may still be disabled if her impairments do not meet or equal a Listing. In that case, the Commissioner must next assess the claimant's residual functional capacity ("RFC"). *See* 20 C.F.R. §§ 404.1520(a)(4), (e), 416.920(a)(4), (e). RFC measures what an individual "can do in a work setting" despite the person's physical and mental limitations. *Id.* §§ 404.1545(a)(1), 416.945(a)(1). There are five different categories of RFC: sedentary, light, medium, heavy, or very heavy work. *See generally id.* § 404.1567. The definitions and requirements of these categories are outlined in the relevant statutes. *Id.* § 404.1567(a)

(sedentary work); *id.* § 404.1567(b) (light work); *id.* § 404.1567(c) (medium work); *id.* § 404.1567(d) (heavy work); *id.* § 404.1567(e) (very heavy work).

The RFC is then used to determine, at step four, whether the claimant's impairments prevent her from performing past relevant work, and at step five, whether the claimant can perform other work that exists in the national economy consistent with the claimant's age, education, and work experience. *Id.* §§ 404.1520(a)(4), 416.920(a)(4); *see also Butler*, 353 F.3d at 997. If an individual's claim fails at either step four or step five, the Commissioner will conclude that the individual is not disabled and deny the claimant's benefits request. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

## II.      Record Evidence

### A.      <u>Personal Background</u>

At the time her application was filed, Ms. G. was 59 years old and lived with her husband and sister-in-law. *See* AR 39, 61. She graduated high school and attended two years of college, but she did not earn an associate or bachelor's degree. *See id.* She worked in a public school as a secretary from 1999 to 2007; as a parent liaison from 2007 to 2011; and as a student advocate from 2011 until she retired in November 2019. *See* AR 93, 246. After her injury in 2016, she took sick leave and did not return to work. *See* AR 43.

### B.      <u>November 2016 Injury</u>

On November 10, 2016, while Ms. G. was working at her school on "hall duty," someone threw an orange that hit her in the back of the head. AR 517. This resulted in a "small concussion." AR 511. The evening of the incident, Ms. Green visited a same day emergency clinic, Right Time Medical; she was told to rest. *See* AR 65, 517. She reported no soreness of vertebrae, but light tenderness on the neck where she was struck with the orange. *See* AR 65.

All of her objective medical tests and vitals were normal.  *Id.*  She did not go into work after the incident as she attempted to treat her "continuous problems with headaches."  AR 518.  She reported headaches and nausea shortly after the incident.  *See* AR 517–18.  Several months following the incident, she continued to report that she experienced daily, intermittent headaches brought on by light and sound sensitivity.  *See* AR 350.  The headaches interrupted her sleep, causing fatigue during the day.  *Id.*

At a consultation with Dr. Kevin Crutchfield in February 2017, Ms. G. reported memory disturbance, trouble concentrating, cognitive slowing, and some dizziness when she stood up too quickly, in addition to the pain associated with headaches.  *See* AR 350–51.  At this initial consultation, nearly all her objective medical testing was reported as normal, aside from a cervical spine x-ray that Dr. Crutchfield noted as showing mild spondylosis at the C5–C6 vertebrae.  *See* AR 65, 351.  Dr. Crutchfield observed photosensitivity and tenderness/pain in the neck and shoulders with movement.  *See* AR 351.  Dr. Crutchfield noted that Ms. G. had "cervical strain syndrome," "post traumatic occipital neuritis with trigger point exacerbation of headaches," and "post traumatic migraine headaches."  AR 352.  He suggested that she limit her physical activities and not return to work.  *See* AR 353–54.

She continued going to follow up appointments because her symptoms were not improving.  *See* AR 361–424.  She saw a physician's assistant in Dr. Crutchfield's office and reported similar symptoms and treatments each time.  *Id.*  After Ms. G. underwent various treatments with little improvement and began developing new symptoms, Dr. Crutchfield referred Ms. G. to a nerve doctor, Ivica Ducic.  *Id.*  In July 2017, Dr. Ducic opined that Ms. G. had occipital neuritis and suggested surgery, along with possible alternative treatment options.  *See* AR 425.

Following Dr. Ducic's suggestion, Ms. G. saw another doctor, Dr. Paul Dash, in October 2017. *See* AR 517. She did not receive brain scans, but her neurological and otherwise objective tests all came back normal. *See* AR 518. Dr. Dash reported her gait, motor skills, and muscle tone were also normal. *Id.* He also noted that she was not particularly tender to touch and had a "fairly good [range of motion]" in her neck. *Id.* He wrote that Ms. G. experienced "daily" headaches "accompanied by sensitivity to light and noise" and "has to lie down about 5 times a month" due to the headaches; he noted that Ms. G. "feels the headaches are too severe for her to return to work in a demanding, noisy environment with fluorescent lights." *Id.* Dr. Dash stated that "[s]he still seems disabled" from the incident. AR 444. He diagnosed her with post-concussive syndrome with chronic migraines and noted that she "may be developing a secondary fibromyalgia syndrome with the spread of her pain symptoms and the development of some paresthesias [] in the left arm." *Id.* Dr. Dash suggested she take time off work for the next year. *See* AR 519. He also reported later, in May 2019, that although he disagreed with Dr. Ducic's suggestion to undergo surgery, he thought Ms. G. was disabled and likely permanently disabled. *See* AR 495. Ms. G. continued visiting Dr. Dash and continued reporting similar symptoms and limitations throughout 2018. *See* AR 445–460. Dr. Dash noted that her "symptoms are certainly suggestive of a chronic fibromyalgia condition" in July 2018. AR 451–52.

She also visited a rheumatologist, Dr. David Borenstein, various times beginning in December 2017. *See* AR 461–490. She had a positive ANA test, but presented with no thyroid problems, no rheumatological disorders or autoimmune diseases, and no secondary antibodies, as indicated in the record. *Id.* Dr. Borenstein reported that Ms. G. "has a post-concussion neurologic status" and suggested dry needling and other medications could improve her physical state. AR 532, 687.

Throughout this time, Ms. G. consistently reported, in addition to her fatigue and daily headaches, that she faced cognitive issues since being hit in the head with the orange.  *See* AR 371.  Some of these symptoms include issues with multitasking, mental fogginess, confusion, memory disturbance, and difficulty concentrating.  *Id.*  She also reported issues with balance which she refers to as "vertigo-like symptoms," and some numbness and tingling in her right arm."  AR 47, 371, 418, 664.  For these reasons, she states she has faced limitations resulting from her symptoms.

In August 2020, Ms. G. was referred to Dr. Kyle Chapman to prepare a longer, comprehensive medical opinion specifically for her disability evaluation; no physician/patient relationship was established.  *See* AR 664.  Dr. Chapman restated all the symptoms consistent with previous reports from Ms. G.  *See* AR 664–65.  Nearly all her objective physical testing was normal.  *See* AR 666–67.  Dr. Chapman found her to be alert and awake; reported her gait was normal; reported full range of motion and no muscle atrophy; reported all normal cognitive and speech testing; and reported she was tender to palpitation in her upper back area.  *Id.*  Dr. Chapman recommended that she only frequently lift between 11-20 pounds, occasionally lift between 21-25 pounds, and never lift over 26 pounds.  *See* AR 667.  He also reported that based on Ms. G.'s own subjective claims, she can only walk up to one mile without interruption, sit for two to three hours without any interruption and she requires no assistive devices to function independently.  *Id.*  The doctor also found that Ms. G. could frequently climb stairs and ramps, but never ladders, and that she could frequently stoop, kneel, crouch.  *Id.*  According to Dr. Chapman, Ms. G. could continuously reach overhead, handle, feel, push, pull, and use her feet to operate controls.  *Id.*  Dr. Chapman suggested that Ms. G. may require certain accommodations to help her treat symptoms while working.  *See* AR 668.  These accommodations included taking

frequent breaks, working in a quiet and dimmer environment, stress relief exercises, and memory aids for concentration. *Id.*

Since her head injury, Ms. G. has seen many doctors, received varying diagnoses, and pursued many different forms of treatment. *See* AR 65–66, 82–83, 85 (outlining the list of medical care providers she has visited since November 2016 and the various reports from such visits). She has tried several different prescription medications. *See* AR 248, 276, 515 (listing prescriptions Ms. G. has taken such as celecoxide, chlorzoxazone, gabapentin, rizatriptan, diclofenac, meloxicam, fluticasone). Ms. G. has also utilized other forms of treatment to address her pain. *See* AR 418, 687 (noting that Ms. G. has gone to physical therapy, tried dry needling, and had injections in her back to assist with the pain); AR 425 (Dr. Crutchfield suggesting that surgical treatment is the next reasonable treatment choice). Many of the various doctors Mr. G saw reported similar diagnoses. The diagnoses included nerve and spinal-related pain disorders and other various disorders related to pain diseases. *See* AR 418 (Dr. Dennis Rivenburgh reporting in a note that Ms. G. experienced fatigue, insomnia, headache/migraines, occipital neuritis, cervicalgia of occipito-atlanto-axial region, dyssynergia, whiplash injury to neck); AR 514 (Dr. Dash noting that Ms. G. suffers from post-concussion disorder, fibromyalgia, photosensitivity, and dizziness). Her doctors all confirmed that she suffers from pain, tenderness, and at least a somewhat limited range of motion. *See* AR 425–26, 502–04, 515, 519. Generally, most of her objective physical examinations consistently produced normal results, aside from some issues like raised antibody titer and mild spinal disc space narrowing. *See* AR 412, 421–23, 494–96, 511–519.

Ms. G. followed doctors' suggestions at the various appointments after the incident to rest and not return to work; she did not return to work after the incident in November 2016. *See*

AR 353 (Dr. Crutchfield noting in February 2017 that "the patient cannot return to work at this time/can return to modified duty with [] accommodations"); AR 519 (Dr. Dash noting in October 2017 that "he filled out a form giving her off until the first of next year").  Ms. G. received "income and sick leave from her employer" after she stopped working in November of 2016.  AR 279.  More recently, she has reported some improvements in her conditions.  *See* AR 511 (doctor's notes stating that Ms. G. "notes some improvement in intensity overall with the headaches").

### III.     The Commissioner's Decision

Ms. G.'s disability application was initially denied on or around August 7, 2020, upon a finding that she was "not disabled."  AR 15, 71.  The record shows consideration of all of Ms. G.'s evidence and reports from her doctors.  AR 64–67.  The state examiner doctor and the disability adjudicator at the initial level found that Ms. G. had certain exertional limits placed on her ability to work, but could still perform her past relevant work as actually performed.  *See* AR 71.  Therefore, she was not disabled because her past relevant work did not require her to work outside of those exertional limits.  *Id.*

A new adjudicator reconsidered the evidence in March 2021, with additional evidence from Dr. Chapman, and again found that Ms. G. was not disabled.  *See* AR 81–83.  The new adjudicator sustained the previous RFC evaluation of light.  *See* AR 92.  The adjudicator also again found that Ms. G. could perform her previous relevant work as actually performed when applying the RFC determination.  *See* AR 93.  Thus, the agency found that Ms. G. was not disabled for the purposes of collecting disability benefits.  *See* AR 94.

Next, the ALJ, Thomas Mercer Ray, issued an unfavorable disability determination on August 20, 2021.  *See* AR 12.  At step one he determined that Ms. G. had not engaged in any

substantial gainful employment after her claimed onset date of November 7, 2019.  *See* AR 18.
At step two, he determined that Ms. G.'s degenerative disc disease, migraines, fibromyalgia, and
post concussive syndrome were severe, medically determinable impairments that significantly
limited her ability to perform work activities.  *See* AR 18–19.

At step three, he determined that her impairments did not meet or medically equal the
severity of any of the Commissioner's Listings.  *See* AR 19–20.  He assessed Ms. G.'s
impairments against the criteria in Listing 1.15 ("spinal disorders"), Listing 11.18 ("traumatic
brain injuries"), and Listing 11.02 ("epilepsy" for her migraines).  *Id.*; 20 C.F.R. Pt. 404, Subpt.
P, App. 1, § 1.15 (2021), § 11.18, § 11.02.  For Listing 1.15, he acknowledged the narrow disc
space in her C5–C6 vertebrae but noted "no other acute abnormalities."  AR 19.  He found that
there was no additional evidence of a nerve root compromise as defined in Listing 1.15, she did
not need to use assistive devices to ambulate, and she could still independently function and use
all her extremities.  *Id.*  For Listing 11.18, ALJ Ray concluded that the evidence did not establish
"disorganization of motor function in two extremities . . . for at least three months after the
injury" or a "marked limitation" in various mental functioning "for at least three consecutive
months after the injury."  AR 20.  He did, however, find that Ms. G.'s "fibromyalgia results in
more than a minimal limitation in her ability to engage in work related activities, establishing the
de minimus severity requirement."  *Id.*  But he did not conclude that the effects of the
fibromyalgia in combination with her other severe impairments met or medically equaled any
listing.  *See id.*  Finally, under Listing 11.02, ALJ Ray concluded that Ms. G.'s medical record
did not establish that her migraines occurred in a frequency and type that satisfied the Listing
criteria.  *Id.*

ALJ Ray then determined that Ms. G.'s RFC was medium.  *See* AR 20–26.  ALJ Ray weighed Ms. G.'s subjective reporting of her symptoms with professional opinions of her exertional limits, along with her medical history to find that she fell under the medium RFC category.  *Id.*  The ALJ relied on Ms. G.'s own testimony, in which she rated her daily pain as generally a two or three, as well as evaluations and testing which generally showed normal findings.  *See* AR 20–22.  Based on his RFC calculation of medium, ALJ Ray determined at step four that Ms. G. could perform her past relevant work because he concluded that her past relevant work was considered either a sedentary or light RFC.  *See* AR 25–26.  He based this conclusion on the Vocational Expert testimony and the Dictionary of Occupational Titles.  This holding necessitated a determination that Ms. G. was not disabled for the purposes of collecting Social Security Insurance and Social Security Disability Benefits.  *See* AR 26.

## LEGAL STANDARD

The Court will uphold the Commissioner's decision to deny an individual disability benefits if the decision "is based on substantial evidence in the record and correctly applies the relevant legal standards."  *Butler*, 353 F.3d at 999.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation and citation omitted); *see also Butler*, 353 F.3d at 999 (substantial evidence is "more than a scintilla, but . . . less than a preponderance"); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency [in the administrative appeals context] is not high.").  Courts must carefully scrutinize the entire record, but may not reweigh the evidence, *Cunningham v. Colvin*, 46 F. Supp. 3d 26, 32 (D.D.C. 2014) (citing *Brown v. Barnhart*, 370 F.Supp.2d 286, 288 (D.D.C.2005)), because the "[s]ubstantial-evidence review is

highly deferential to the agency fact-finder," *Rossello ex rel. Rossello v. Astrue*, 529 F.3d 1181,

1185 (D.C. Cir. 2008) (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)).  If the court

concludes the ALJ made an error, it should "affirm the Commissioner's decision unless the error

is prejudicial."  *Saunders v. Kijakazi*, 6 F.4th 1, 5 (D.C. Cir. 2021).  This is referred to as the

"harmless error" rule.  *Id.*

## DISCUSSION

Ms. G. raises several challenges to the ALJ's decision.  *See generally* Pl.'s Mem.  First,

Ms. G. argues that ALJ Ray erred at step three in evaluating her cervical spine impairment under

Listing 1.15—which became effective on April 2, 2021, after Ms. G. filed her application for

benefits for November 9, 2019—instead of Listing 1.04, which was in effect when Ms. G. filed

her application.  *See* Pl.'s Mem. at 5.  Second, Ms. G. contends that ALJ Ray erred in his RFC

finding because he put limits on her work capabilities that conflict with the minimum

requirements of a medium RFC, he did not follow the Treating Physician Rule, and he did not

properly assign weight to her subjective reports of pain.  *Id.* at 11–12.  Finally, Ms. G. posits that

because her RFC should have been determined as light, ALJ Ray should have followed the

Medical Vocational Guideline Rules, which would have required the ALJ to find her "disabled."

*Id.* at 14.  The Commissioner defends the ALJ's decision in all respects and urges the Court to

affirm.  *See generally* Def.'s Mem.  The Court will review the parties' arguments below in turn.

## I.       Relevant Listing

In evaluating whether Ms. G. had a spine impairment that qualified under a Listing, the

ALJ applied Listing 1.15.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.15 (2021).  Listing 1.15

came into effect *after* Ms. G. applied for benefits but *before* the ALJ issued his decision; it

replaced Listing 1.04, which was the listing in effect when Ms. G. applied for benefits.  *See* 20

C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04 (2019).  Ms. G. argues that at step three, ALJ Ray should have applied Listing 1.04 in considering whether she met the statutory requirements for disability.  *See* Pl.'s Mem. at 5.  She contends that applying Listing 1.15 was an impermissible "retroactive rule making."  Pl.'s Reply at 2.  She asserts that if the ALJ applied Listing 1.04, which was in place at the time she applied for benefits, she would have met the requirements of the Listing since evidence showed she had "nerve root compression" and "clearly had neuro-anatomic distribution of pain."  Pl.'s Mem. at 5–7; Pl.'s Reply at 1–3.  She does not argue that her impairments satisfied all four criteria in Listing 1.15.  *See generally* Pl.'s Mem.; Pl.'s Reply.

The Commissioner argues that the ALJ appropriately applied Listing 1.15, citing case law in support.  *See* Def.'s Mem. at 11–12.  He asserts that ALJ Ray properly weighed the evidence in finding that Ms. G. did not meet her burden of showing that she met the A, B, C, and D criteria in Listing 1.15.  *Id.* at 13–15.  He further contends that even if Listing 1.04 would have applied, Ms. G. would not have been found disabled because "she failed to show evidence of nerve root compression" and "evidence that she is unable to ambulate effectively."  *Id.* at 12.

To meet or equal a Listing, a claimant must satisfy all of the Listing's criteria.  *Beynum v. Barnhart*, 435 F. Supp. 2d 142, 146 (D.D.C. 2006) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original) ("[F]or a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria.")).  At the time that Ms. G. applied for benefits, the Listing in place for spine disorders was Listing 1.04.  While her application was pending, the administration promulgated and implemented a new Listing for spine disorders, Listing 1.15, which replaced Listing 1.04.  ALJ Ray applied Listing 1.15 to his adjudication of Ms. G.'s claim.  *See* AR 19.  Listing 1.15 requires that four symptoms are present:

> A. Neuro-anatomic (radicular) distribution of one or more of the following symptoms consistent with compromise of the affected nerve root(s):

1. Pain; or
2. Paresthesia; or
3. Muscle fatigue; AND

B. Radicular distribution of neurological signs present during physical examination (see 1.00C2) or on a diagnostic test (see 1.00C3) and evidenced by 1, 2, and either 3 or 4:

1. Muscle weakness; and
2. Sign(s) of nerve root irritation, tension, or compression, consistent with compromise of the affected nerve root (see 1.00F2); and
3. Sensory changes evidenced by:
   a. Decreased sensation; or
   b. Sensory nerve deficit (abnormal sensory nerve latency) on electrodiagnostic testing; or
4. Decreased deep tendon reflexes; AND

C. Findings on imaging (see 1.00C3) consistent with compromise of a nerve root(s) in the cervical or lumbosacral spine; AND

D. Impairment-related physical limitation of musculoskeletal functioning that has lasted, or is expected to last, for a continuous period of at least 12 months, and medical documentation of at least one of the following:

1. A documented medical need (see 1.00C6a) for a walker, bilateral canes, or bilateral crutches (see 1.00C6d) or a wheeled and seated mobility device involving the use of both hands (see 1.00C6e(i)); or
2. An inability to use one upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements (see 1.00E4), and a documented medical need (see 1.00C6a) for a one-handed, hand-held assistive device (see 1.00C6d) that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand (see 1.00C6e(ii)); or
3. An inability to use both upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements (see 1.00E4).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.15 (2021) (capitalization in original).[5] ALJ Ray found

that Ms. G. had not satisfied the criteria in the Listing and concluded that she did not meet

---

[5] By contrast, Listing 1.04's requirements were arguably less stringent—it only required the claimant to satisfy one of three conditions, not all three. Listing 1.04's criteria required that a claimant establish:

Listing 1.15.  *See* AR 19.  Ms. G. does not argue that her impairments met the requirements of Listing 1.15; she argues instead that Listing 1.04 should apply and her impairments satisfy *that* listing.

Although judges in this District were previously divided over which Listing applies to a claimant's social security disability application when a Listing is modified or replaced during the pendency of the application, the United States Court of Appeals for the D.C. Circuit recently resolved this issue in *Cox v. Kijakazi*, 77 F. 4th 983 (D.C. Cir. 2023).  In *Cox*, the D.C. Circuit held that ALJs are permitted to apply the Listing that is in effect when they adjudicate a claim, instead of the Listing that was in effect when the claimant applied for benefits.  *Id.* at 991–94.  Specifically, the Circuit Court held that applying a new Listing is not retroactive rulemaking as a matter of law because there is no vested right to have a claim adjudicated under the existing Listing at the time of filing an application for disability benefits; new Listings do not deprive applicants of their ability to prove entitlement to the benefits they applied for because there are alternative ways to prove they are disabled (at steps four and five); and new Listings do not place new obligations on claimants or others.  *Id.*  The court in *Cox* also distinguished the Social

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); OR

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; OR

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04 (2019).

Security Administration's promulgation of new Listings from other caselaw finding retroactive rulemaking impermissible:

> [*National Mining*] did not hold that any rule that makes a party's success less likely is impermissibly retroactive. . . . Those regulations bear no resemblance to the Listings at issue here. The new Listings alter one aspect of a multi-step disability assessment process through which Cox seeks benefits, as part of the Administration's regular updating of medical criteria to determine disability.

*Id.* at 994 (discussing *National Mining Ass'n v. Department of Labor*, 292 F.3d 849 (D.C. Cir. 2002) (per curiam)).  Therefore, in line with the D.C. Circuit's holding in *Cox*, the Court finds that ALJ Ray was permitted to apply Listing 1.15 when adjudicating Ms. G.'s claim for disability based on spinal disorders and accordingly does not find that he erred in *not* applying Listing 1.04.  Ms. G.'s reliance on the lower court's decision in *Cox*, that found the ALJ had erred in applying a new Listing that was placed in effect while the claimant's application was pending, is therefore inapposite.  *See Cox v. Kijakazi*, No. 18-cv-2389, 2022 WL 178953 (D.D.C. Jan. 19, 2022) *rev'd and remanded*, 77 F.4th 983 (D.C. Cir. 2023); Pl.'s Reply at 2.

Having found that Listing 1.15 was properly applied, the undersigned considers whether substantial evidence supported the ALJ's conclusion that Ms. G. did not exhibit evidence of nerve root compression, as criteria A, B, and C in Listing 1.15 require.  *See* Pl.'s Mem. at 6.  The ALJ concluded that there was "no evidence of nerve root compromise at any level" because her x-ray "was consistent with mild disc space narrowing at C5–C6, but otherwise no acute abnormalities."  AR 19.  The ALJ's conclusion is supported by Ms. G.'s medical record, which only showed "mild disc space narrowing" between two vertebrae.  *Id.*  The decision contains an "accurate and logical bridge" that links the record evidence to the ALJ's conclusions.  *Dowell v. Colvin*, 232 F. Supp. 3d 1, 8 (D.D.C. 2017).  Ms. G. does not appear to argue that she qualified for *all* the criteria in Listing 1.15—specifically the D criterion, which requires a "physical

limitation of musculoskeletal functioning"—even though she needed to satisfy all four criteria in the Listing to be considered disabled under the Listing.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.15 (2021).  The undersigned therefore concludes that ALJ Ray appropriately applied Listing 1.15 and did not err in his conclusion that Ms. G. did not meet the Listing.

## II.     RFC Determination

ALJ Ray concluded that Ms. G.'s RFC was medium, except that she could only occasionally lift or carry 25 pounds and frequently lift or carry 20 pounds.  *See* AR 20–21.  Ms. G. argues that the ALJ incorrectly calculated her RFC in several respects.  Each of these arguments are addressed below.

### A.  <u>Additional Limitations on RFC Finding</u>

First, Ms. G. argues that ALJ Ray erred because he added modified limitations to her RFC that do not meet the minimum statutory requirements for a medium RFC.  *See* Pl.'s Mem. at 11–12.  The Commissioner asserts that ALJs may proscribe certain modifications to an RFC determination, such as exertional limitations on lifting.  *See* Def.'s Mem. at 16–17.  And regardless, even if the ALJ concluded that Ms. G.'s RFC was light—which Ms. G. argues he should have done—Ms. G. would have been able to perform her past relevant work, which consisted of light and sedentary jobs.  *See id.* at 16.

In determining Ms. G.'s RFC, ALJ Ray considered a wide range of medical evidence from the record.  He concluded that Ms. G. could do medium work, but that she could only occasionally lift or carry 25 pounds and frequently lift or carry 20 pounds.  *See* AR 20–21.  He considered her symptoms and the extent to which such symptoms were consistent with objective medical evidence.  *See* AR 21.  He found that her impairments "could reasonably be expected to cause the alleged symptoms" but her "statements concerning intensity, persistence and limiting

effects of these symptoms are not entirely consistent with the medical and other evidence."  AR 22.

ALJ Ray noted that Ms. G. was diagnosed with chronic migraines and fibromyalgia, which began after her "minor head injury" in November 2016.  *Id.*  Her cognitive testing scores were consistent with normal findings, he wrote, although she still had residual overhead light sensitivity and presented some difficulty with household chores.  *See id.*  But it was reported that her headaches improved with conservative treatment modalities and her range of motion had increased.  *See* AR 22–23.  ALJ Ray concluded that Ms. G.'s medical record did not support limitations greater than those proscribed in a medium RFC with certain limitations—she did not present cognitive defects, her positive ANA test did not exhibit signs of a rheumatic autoimmune disease, her gait was normal, and she had improved range of motion.  *See* AR 23.  In crafting the RFC, ALJ Ray adopted Dr. Chapman's exertional limit restrictions.  AR 24.  Ms. G. argues that her RFC should have been calculated as light if the ALJ also found she could only occasionally lift or carry 25 pounds and frequently lift or carry 20 pounds, because a medium work RFC entails lifting 50 pounds.  *See* Pl.'s Mem. at 11–12 (citing 20 C.F.R. § 404.1567(c)).

The statutory guidelines for medium work specify that the individual *cannot lift more than* 50 pounds but can frequently lift and carry 25 pounds.  *See* 20 C.F.R. § 404.1567(c) (emphasis added).  Statutory guidelines for light work "involve[] lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  *Id.* § 404.1567(b).  An RFC outlines the "most" work a claimant can do despite her limitations.  *Id.* § 404.1545(a)(1).

RFC determinations can be appropriate even if the ALJ finds that the claimant cannot perform the full range of work for a particular RFC category.  *See, e.g.*, *Kyler v. Kijakazi*, No.

19-cv-03334, 2022 WL 1165859, at *9 (D.D.C. Apr. 20, 2022) (concluding that the plaintiff could perform a "narrow range of sedentary work" with additional limits placed on the outer statutory limitations of sedentary work); *Santiago v. Barnhart*, 367 F. Supp. 2d 728, 733 (E.D. Pa. 2005) ("There is nothing oxymoronic in finding that a plaintiff can perform a *limited* range of light work. Such a finding is appropriate where, as here, the evidence shows that the plaintiff can perform some, though not all, of the exertional requirements of a particular range."). In addition, "[c]ourts have found that medium work is consistent with avoidance of heavy lifting." *Patricia T. v. Kijakazi*, No. 21-cv-1028, 2022 WL 3583634, at *10 (D.D.C. Aug. 22, 2022). Ms. G. has not directed the Court to case law that prohibits ALJs from placing limits on a claimant's RFC, and the Court has found no such cases.

Thus, in certain circumstances the ALJ may find that it is necessary to include modifications to a claimant's RFC, and the undersigned finds that ALJ Ray appropriately did so in this instance. ALJ Ray's reasoning as to why he added modifications was supported by the record and substantial evidence, specifically Ms. G.'s own physician's recommendation. Therefore ALJ Ray did not err by classifying Ms. G.'s RFC as medium instead of light, and the Court therefore affirms the RFC determination on that basis.

## B. The ALJ's Weighing of the Evidence

Ms. G. also posits that ALJ Ray erred in the weight he attributed to various pieces of evidence in determining the appropriate RFC. Each of these issues is addressed below in turn.

### 1. Treating Physician Rule and Weighing of Physician Evidence

First, Ms. G. argues that the Treating Physician Rule required ALJ Ray to give more weight to Dr. Dash's opinion that she was "likely permanently disabled;" Dr. Crutchfield's opinion that she should not return to work; and Dr. Chapman's opinion that she could not

perform medium work.  Pl.'s Mem. at 12.  She argues that because they were her "treating

physicians," the ALJ should have afforded controlling weight to them.  *Id.*  The Commissioner

argues that the treating physician rule does not apply, and in any event, the ALJ appropriately

considered the medical evidence.  *See* Def.'s Mem. at 22.[6]

First, regarding the treating physician rule, on January 18, 2017, the SSA published

updated rules in Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg.

5844-01 (2017).  These revisions repealed the "treating physician rule," which provided that a

treating physician's report is "binding on the fact-finder unless contradicted by substantial

evidence."  *Butler*, 353 F.3d at 1003 (articulating the rule in the D.C. Circuit).  The revised

regulations state that ALJs should consider the "persuasiveness" of opinions from all medical

sources, rather than giving "any specific evidentiary weight, including controlling weight, to any

---

[6] The Commissioner argues that many medical records upon which Ms. G. relies in furtherance of her argument pre-date the alleged onset date and therefore did not need to be considered by the ALJ at all.  Def.'s Mem. at 26 (citing *Brogan-Dawley*, 484 F. App'x 632, 633 (2d Cir. 2012)).  In *Brogan-Dawley*, the court held that "[t]he evidence showed that [claimant's] impairments predated or postdated the relevant period or did not significantly limit[ ] her physical or mental ability to do basic work activities."  484 F. App'x at 633 (internal citations omitted).  But here, no party contests that the relevant medical evidence upon which Ms. G. relies post-dates the injury that caused her impairments, which occurred on November 16, 2016.  *See, e.g.*, AR 353 (Dr. Crutchfield's medical notes stating that "[i]t is with a high degree of medical certainty that this patient's current signs and symptoms were caused or exacerbated by the [November 2016] injury").  And, the Commissioner has not identified any similar case law outside the Second Circuit.  To the contrary, case law in this District casts doubt on the Commissioner's position.  "Although an applicant does not become *eligible* for SSI benefits until the date of her SSI application, it does not follow that the ALJ or reviewing court may not consider evidence predating the application when determining whether the applicant is disabled."  *Dotson v. Comm'r of Soc. Sec.*, No. 19-cv-00043, 2021 WL 3519738, at *3 n.3 (D.D.C. May 27, 2021), *report and recommendation adopted*, No. 19-cv-00043, 2022 WL 5241853 (D.D.C. Oct. 6, 2022); *see also Corcoran v. Astrue*, No. 08-cv-913, 2009 WL 3100350, at *13 (D. Md. Sept. 22, 2009) ("Other Circuits have explicitly held that the ALJ may, and sometimes must, consider medical evidence which predates the alleged onset of disability.").  Thus the Court does not find this argument persuasive or consistent with case law.

medical opinion(s) . . . including those from [claimant's] medical sources." 20 C.F.R. §
404.1520c(a).  The revised regulations apply to social security claims filed on or after March 27,
2017.  *Id.* § 404.1520c.

Separate from the SSA's regulations, "[t]he D.C. Circuit had 'a treating physician rule of
[its] own,' which similarly required the fact-finder to give a treating physician's opinion
controlling weight 'unless contradicted by substantial evidence.'"  *David W. v. Kijakazi*, No. 21-
cv-3370, 2023 WL 5035935, at *10 (D.D.C. Aug. 8, 2023) (quoting *Butler*, 353 F.3d at 1003)
(further quotation marks and citation omitted).  But while the D.C. Circuit has not yet spoken on
whether its treating physician rule survived the revised regulations, other courts in this District
have applied the revised regulations.  *See Tiana O. v. Kijakazi*, No. 20-cv-2051, 2023 WL
5348747, at *6 (D.D.C. Aug. 21, 2023) ("Plaintiff's argument that the independent treating
physician rule . . . still applies despite Social Security's revised regulations is incorrect.")
(internal quotation marks and citation omitted); *Bullock v. Kijakazi*, No. 20-cv-1764, 2023 WL
5023380, at *5 (D.D.C. Aug. 8, 2023) (finding that the treating physician rule no longer applies
to cases filed on or after March 27, 2017); *Devylle C. v. Kijakazi*, No. 22-cv-01061, 2023 WL
4864600, at *11 n.13 (D.D.C. July 31, 2023) ("This Court, like a number of other district courts,
agrees that the new regulations are binding upon it and abrogate prior inconsistent precedent like
the D.C. Circuit's own treating physician rule.").

The treating physician rule does not apply here because Ms. G. applied for social security
benefits on November 9, 2019—after the new regulations went into effect.  *See Emery P. v.
Kijakazi*, No. 21-cv-3147, 2023 WL 5973991, at *8 (D.D.C. Sept. 14, 2023) ("For claims filed
after March 27, 2017, ALJs are not required to defer or give specific evidentiary weight to
medical opinions from claimants' treating providers.") (citing 20 C.F.R. 404.1520c(a)).

Accordingly, the Court will proceed by applying the revised regulations to determine whether the ALJ properly weighed the opinion of Ms. G.'s treating physicians.

"Under the revised regulations . . . an ALJ shall not give specific evidentiary weight to any medical opinion, 'including those from [the claimant's] medical sources.'" *Emery P.*, 2023 WL 5973991, at *8 (quoting 20 C.F.R. §§ 404.1520c(a), 416.920c) (alteration in original). "Instead, the ALJ must decide how persuasive []he finds all medical opinions according to five factors: (1) supportability; (2) consistency; (3) the medical source's relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict a medical opinion.'" *Tiana O.*, 2023 WL 5348747, at *6 (citing 20 C.F.R. §§ 404.1520c(b)–(c)) (quotation omitted). "The most important factors in the persuasiveness analysis are (1) supportability—that is, how well the medical source supported the opinion with objective medical evidence and supporting explanations—and (2) the consistency of the opinion with other evidence in the record." *David W.*, 2023 WL 5035935, at *10 (citing 20 C.F.R. §§ 416.920c(b)(2), 416.920c(c)(1)–(2)) (quotation omitted). "[T]here is no specific format required for addressing supportability and consistency, and those terms need not be used in the opinion, provided that there is sufficient explanation for a reviewing court to determine that the ALJ analyzed those factors." *Id.* at *11.

Second, regarding some of the medical opinions that Ms. G. argues the ALJ erroneously weighed—such as Dr. Dash's notes, which said that Ms. G. was "likely permanently disabled," and Drs. Crutchfield and Chapman's opinions, who both said that Ms. G. was unable to perform work consistent with a medium RFC—the Commissioner points out as a legal matter that "an ALJ is not required to provide any analysis regarding statements on issues reserved to the Commissioner, such as whether the claimant is disabled." Def.'s Mem. at 26 (citing 20 C.F.R. §

404.1520b(c)(3)(i); 20 C.F.R. § 404.1520b(c)(3)); Pl.'s Mem. at 12.  Indeed, relevant regulations state that the Commissioner is "responsible for making the determination or decision about whether [the claimant is] disabled or blind;" evidence regarding "the issue of whether [the claimant is] disabled or blind under the Act . . . is inherently neither valuable nor persuasive;" and ALJs need not "provide any analysis about how [they] considered such evidence in [their] determination or decision."  20 C.F.R. § 404.1520b(c)(3).  Statements about whether the claimant is or is not disabled, able to work, or able to perform regular and continuing work, and statements about a claimant's residual functional capacity (instead of descriptions about functional abilities and limitations) fall into this category of "unpersuasive evidence" that ALJs need not consider.  *Id.* § 404.1520b(c)(3)(i), (v), (vi).

The Commissioner is therefore correct that statements that provide opinions on whether Ms. G. is disabled or unable to work or whether she qualifies for a medium RFC can be dismissed by an ALJ as "neither valuable nor persuasive on the issue of Plaintiff's disability under the Act."  Def.'s Mem. at 27 (citing 20 C.F.R. §§ 404.1504; 404.1520b(c)(1)).  Dr. Dash opined that Ms. G. was "disabled," so ALJ Ray did not consider such evidence in his analysis.  Similarly, ALJ Ray did not consider both Dr. Chapman's opinion that Ms. G. was unable to perform medium work, and Dr. Crutchfield's opinion that Ms. G. should not perform work on a regular or continuing basis.

Regarding ALJ Ray's analysis of both physicians' other medical opinions, the ALJ concluded that Dr. Chapman was knowledgeable and provided clear explanations but that his opinion "appear[ed] to rely too heavily on the claimant's subjective reports in some aspects." AR 24.  Specifically, ALJ Ray found Dr. Chapman's stated levels of restrictions for Ms. G.'s standing, walking, and sitting to be inconsistent with his other findings that she retained full

muscle strength and a normal gait; her migraines responded generally well to conservative treatment modalities; and she had only mild disc space narrowing at C5–C6 but no other acute abnormalities.  *Id.*  Ms. G.'s testimony at the hearing—that she walks about one mile per day and that she does not experience sensitivity to light—further contradict Dr. Chapman's findings, ALJ Ray found.  *Id.*  ALJ Ray further questioned Dr. Chapman's conclusion that Ms. G. could not operate a motor vehicle "despite evidence to the contrary showing that she retains normal strength and gait without the use of any assistive devices."  *Id.*  Thus, ALJ Ray found Dr. Chapman's opinion "not entirely persuasive."  AR 25.  This analysis squarely addresses the consistency factor, as it determines that Dr. Chapman's assessment was not consistent with other evidence in the record.  It also addresses the supportability factor, in that it notes that Dr. Chapman's opinion was not well-supported by other medical evidence.

Ms. G. also argues that the ALJ did not properly consider Dr. Crutchfield's medical opinions on postural limitations—that Ms. G. should be limited to "seated duty only, no more than 4 days per week with limited walking and no standing [and] reduction of fluorescent lights and ergometric accommodations."  AR 354, 364.  For the same reasons articulated in the preceding paragraph—such as evidence that Ms. G. walks about one mile per day and that she does not experience significant sensitivity to light—the ALJ properly discounted this opinion based on other evidence in the record.  AR 24.  The testimony from Ms. G. contradicts the basis for the opinion that she must be on "seated duty only" "with limited walking."  AR 354, 364.

For the aforementioned reasons, the ALJ properly discounted certain physicians' opinions in calculating Ms. G.'s RFC.  Thus the Court affirms the ALJ's RFC determination on this basis.

### 2.       *Weight of Objective Evidence in Fibromyalgia Cases*

Next, Ms. G. argues that ALJ Ray erred in his decision to afford less weight to Dr.

Chapman's opinions because he relied too heavily on her subjective reports about her

fibromyalgia.  She argues that ALJs are not permitted to discount a claimant's subjective

reporting of fibromyalgia symptoms because of a lack of objective medical evidence about the

condition.  *See* Pl.'s Mem. at 12–13 (citing *Arakas v. Comm'r, Soc. Sec. Admin.* 983 F.3d 83, 97

(4th Cir. 2020)) (noting that fibromyalgia is a disease in which symptoms are "entirely

subjective").  She contends that she expressed consistent and significant subjective complaints of

pain and limitations due to her fibromyalgia, and ALJ Ray should not have been allowed to

disregard Dr. Chapman's opinion on her physical limitations based on a lack of objective testing

abnormalities.  *See* Pl.'s Mem. at 13.  The Commissioner contends that "it is still reasonable for

the ALJ to review objective records" in fibromyalgia cases and conclude that normal

examinations are inconsistent with disabling limitations.  Def.'s Mem. at 19.  He further asserts

that the ALJ considered other evidence of Ms. G.'s symptoms that contradicted her "subjective

allegations of disability."  *Id.*

Ms. G. relies on *Arakas*, a Fourth Circuit case that held an ALJ could not discredit a

claimant's subjective statements about her symptoms simply because there was no objective

evidence supporting those symptoms, or if the symptoms were not consistent with objective

evidence.  983 F.3d at 97 ("ALJs may not rely on objective medical evidence (or the lack

thereof)—even as just one of multiple factors—to discount a claimant's subjective complaints

regarding symptoms of fibromyalgia or some other disease that does not produce such

evidence.").  But only one case in this Circuit has cited to and adopted the reasoning in *Arakas*

when assessing an ALJ's consideration of a claimant's subjective symptoms.  *Ruppert v.*

*Kijakazi*, No. 20-CV-3725, 2022 WL 1081115, at *8 (D.D.C. Apr. 11, 2022).  The D.C. Circuit

has not adopted *Arakas*, and thus it is not binding on this Court.[7]

Though an ALJ cannot reject a claimant's statements about her pain "solely because they

are not substantiated by objective medical evidence, the ALJ may consider whether there are any

inconsistencies in the evidence and the extent to which there are any conflicts between [the

claimant's] statements and the rest of the evidence." *McCormick v. Saul*, No. 18-cv-1704, 2021

WL 2634732, at *9 (D.D.C. June 25, 2021) (internal quotations and citations omitted).  With

respect to fibromyalgia specifically, some courts in this District have acknowledged that because

fibromyalgia does not generate objective testing abnormalities, it is improper to disregard

medical evidence because of a lack of objective testing.  *Stackhouse v. Barnhart*, 435 F. Supp. 2d

28, 34 (D.D.C. 2006) (finding that an ALJ's decision disregarding a treating physician's opinion

about a plaintiff with fibromyalgia due to a lack of objective medical evidence was improper).

In considering Ms. G.'s fibromyalgia, ALJ Ray first concluded that her impairment

significantly limited her ability to perform basic work activities and resulted in "more than a

minimal limitation in her ability to engage in work."  AR 18, 20.  Although he did not find that

her symptoms met or medically equaled an applicable listing, the ALJ "considered the claimant's

fibromyalgia and the effects of the condition in determining the claimant's residual functional

capacity."  AR 20.  Later on, ALJ Ray correctly outlined the two-step analysis in evaluating a

claimant's symptoms.  *See* AR 21.  First, the ALJ must determine whether objective medical

evidence presents a "medically determinable impairment" that could reasonably be expected to

---

[7] Other Circuits have cast doubt on or rejected *Arakas*.  *See, e.g.*, *Nielsen v. Comm'r*,
SSA, No. 21-cv-4136, 2022 WL 15570650, at *5 (10th Cir. Oct. 28, 2022); *Janice P. v. Kijakazi*,
No. 5:21-cv-55, 2022 WL 2251666, at *8 (D. Vt. Apr. 22, 2022), *appeal dismissed* (Sept. 13,
2022) ("[*Arakas*] does not appear to be the law in the Second Circuit.").

produce the claimant's alleged symptoms.  20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL

1119029, at *3 (Mar. 16, 2016).  Second, after finding a medically determinable impairment, the

ALJ must assess the intensity and persistence of the alleged symptoms to determine how they

affect the claimant's ability to work and whether the claimant is disabled.  *See* 20 C.F.R. §

404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4.  ALJ Ray outlined in detail Ms. G.'s

subjective symptoms and found that her symptoms "could reasonably expected to cause the

alleged symptoms, [but] the claimant's statements concerning the intensity, persistence and

limiting effects of these symptoms are not entirely consistent with the medical evidence and

other evidence in the record for the reasons explained in this decision."  AR 22.  ALJ Ray

reasoned that "her symptoms responded relatively well to conservative treatment modalities"—

she demonstrated normal muscle strength, improved range of motion, and her own testimony

showed that she can do a variety of chores and go for walks.  AR 22–23.

     The case law does not suggest ALJ Ray erred in his consideration of Ms. G.'s subjective

evidence.  "Evidence like the foregoing[, such as imaging, positive responses to treatment, and

subjective statements about pain,] that conflicts with Plaintiff's assertion that she is physically

disabled and that demonstrates the improvement of her [] pain in response to treatment" can be

used by the ALJ to "discount [] assertions of disabling limitations, and support[] the ALJ's RFC

finding."  *Yamise R. v. Kijakazi*, No. 21-cv-3059, 2023 WL 7074088, at *13 (D.D.C. Oct. 25,

2023) (internal quotations and citations omitted).  Indeed, ALJ Ray relied on imaging, evidence

that Ms. G.'s migraine symptoms improved from treatment, and Ms. G.'s own testimony about

her pain in his conclusion.  *See* AR 24.  He appropriately "considered whether there [were] any

inconsistencies in the evidence and the extent to which there [were] any conflicts between [the

claimant's] statements and the rest of the evidence." *McCormick*, 2021 WL 2634732, at *9 (internal quotations and citations omitted).

And, contrary to Ms. G.'s assertion, ALJ Ray did *not* completely disregard Dr. Chapman's opinions on her fibromyalgia and other symptoms. *See, e.g.*, AR 20 (finding Ms. G. could never lift more than 25 pounds, as Dr. Chapman suggested); *see supra* Section II.B.1 (noting that ALJ Ray found only some of Dr. Chapman's conclusions unpersuasive). As to Ms. G.'s disagreements with ALJ Ray's consideration of her subjective complaints, Ms. G. does not point to specific symptoms that the ALJ allegedly disregarded but instead takes issue with ALJ Ray's conclusion that she was not disabled and was capable of performing medium work. *See generally* Pl.'s Mem.; Pl.'s Reply. For example, Ms. G. mentions her "many subjective complaints suggesting fibromyalgia" but only specifies "trigger point exacerbations of her neuritis and migraines," which ALJ Ray considered in his determination. Pl.'s Mem. at 13; AR 23. In her Reply, she again fails to articulate specific subjective complaints, instead saying that the ALJ erred because "he did not consider her complaints . . . which consistently showed she cannot perform medium work." Pl.'s Reply at 4. Ms. G. does not identify what symptoms and what complaints the ALJ ignored. She cites one example in which she said it was improper for the ALJ to conclude that she could drive because moving her neck would instigate "the worst of her symptoms," but the ALJ concluded, based on medical evidence, that her neck mobility was only "mildly reduced." Pl.'s Mem. at 13; AR 22. This is supported by medical evidence in the record indicating Ms. G.'s range of motion improved, and the undersigned declines to disturb the ALJ's conclusion on this issue. AR 666–67; *Cunningham*, 46 F. Supp. 3d at 32 (holding that courts may not reweigh the evidence).

In her Reply, she again points to Drs. Dash, Chapman, and Crutchfield's conclusory opinions about Ms. G.'s alleged disability and ability to work—but the ALJ did not need to consider such opinions for the reasons discussed above.  Pl.'s Reply at 4–5; *see supra* Section II.B.1.  She otherwise points to Drs. Chapman and Crutchfield's lifting and postural restrictions, respectively.  *See* Pl.'s Reply at 4–5.  ALJ Ray adopted Dr. Chapman's lifting restrictions in the RFC.  *See* AR 23–24.  As to the postural limitations, ALJ Ray concluded that such limitations did not comport with objective evidence or Ms. G.'s own subjective testimony about her symptoms.  *See* AR 22–25; *see supra* Section II.B.1 (explaining why the ALJ's consideration of this evidence was appropriate).

For the reasons discussed above, the ALJ appropriately considered evidence regarding Ms. G.'s fibromyalgia diagnosis and symptoms when calculating her RFC.  Therefore, the Court affirms the ALJ's RFC determination on this basis.

### *3.*       *ALJ Ray's Consideration of the State Examiners' Determinations*

Ms. G. argues that ALJ Ray's RFC determination was flawed because the state examiners' assessments of Ms. G.'s exertional limitations noted that she could only occasionally lift 20 pounds and frequently lift 10 pounds—in other words, they found that she was never able to lift more than 20 pounds.  *See* Pl.'s Mem. at 13.  Ms. G. contends that ALJ Ray's determination of a medium RFC improperly disregarded the examiners assessments' because the statutory guidelines for medium work specify that the individual can *frequently* carry *25* pounds.  *See* 20 C.F.R. § 404.1567(c) (emphasis added).  The Commissioner contends that ALJ Ray merely adopted Dr. Chapman's exertional restriction limitation instead of the State agency consultants' opinion.  *See* Def.'s Mem. at 25.  In any event, the Commissioner argues that even if

the ALJ adopted the light exertional limitations, Ms. G. still would have been able to perform her past relevant work, which is classified as light.  *Id.*

The ALJ—not Ms. G.'s treating or examining physicians or State agency consultants—makes the ultimate disability and RFC determinations.  *See* 20 C.F.R. §§ 404.1527(e)(1), 404.1546(c).  As noted, ALJ Ray was faced with competing exertional limitations offered by the agency consultants and one of Ms. G.'s principal physicians—a physician who Ms. G. argues the ALJ "erred by failing to give greater weight to" and "disregarding [his] recommended restrictions."  Pl.'s Mem. at 12.  This Court "may not reweigh the evidence presented to it when reviewing a disability claim . . . nor may it replace the Secretary's judgment concerning the weight and validity of the evidence with its own."  *Ali v. Colvin*, 236 F. Supp. 3d 86, 94 (D.D.C. 2017) (citing *Davis v. Heckler*, 566 F. Supp. 1193, 1195 (D.D.C. 1983)).

ALJ Ray explained his reasoning for relying on Dr. Chapman's exertional limitation recommendations, noting that Dr. Chapman's findings were clear.  *See* AR 24.  As to the state agency consultants, he found that their opinions were "generally persuasive" but noted that they had not examined Ms. G.  AR 25.  ALJ Ray further noted that "[n]ew and material evidence received at the hearing level, including testimony of limitations, tend[ed] to show no significantly greater limitations than opined by the State Agency consultants."  *Id.*  This Court is not permitted to supplant its own judgment about the weight apportioned to such evidence if the decision is supported by "substantial evidence."  *Davis*, 566 F. Supp at 1195.  The Court therefore finds that the ALJ's conclusion is supported by substantial evidence and he did not err by adopting Dr. Chapman's proposed lifting restrictions in lieu of the state agency consultants' stated exertional limitations.

III.    **Step Four Determination and The Vocational Guideline Rules**

Finally, Ms. G. argues that ALJ Ray erred by not finding her disabled per Grid Rule

202.06.  *See* Pl.'s Mem. at 14; 20 C.F.R. pt. 404 Subpt. P, App. 2, § 202.06.  The Commissioner

asserts that "the grids" do not apply to the present case because the ALJ found that Ms. G. was

still able to perform her past relevant work with a medium RFC, even accounting for certain

exertional limits.  Def.'s Mem. at 27–28.

"The grids specify whether a significant number of jobs in the national economy exist for

a claimant of a given age, education, work experience, and residual functional capacity (that is,

functional level of work that the claimant can physically perform on a sustained basis)."  *Smith v.*

*Bowen*, 826 F.2d 1120, 1122 (D.C. Cir. 1987).  ALJs may "resort[ ] to the applicable medical

vocational guidelines (also known as 'the grids')" at the fifth step.  *Judea L. v. Kijakazi*, No. 22-

CV-01879, 2023 WL 6065023, at *1 n.6 (D.D.C. Sept. 18, 2023).  As a general matter, the grids

were promulgated "to aid in fifth stage" or step of an ALJ's analysis, and courts consistently

apply them only at this step.  *See, e.g.*, *Smalls v. Shalala*, 996 F.2d 413, 416 (D.C. Cir. 1993)

("When appropriate, the Secretary may employ the medical-vocational guidelines ('grids') to

determine whether there are available jobs in the national economy which the claimant is capable

of performing given her vocational profile."); *Kimberly H. v. Kijakazi*, No. 22-CV-00417, 2023

WL 4450131, at *13 (D.D.C. July 11, 2023) ("[T]he Grids can serve as a useful framework for

determining whether a claimant is disabled at step five even if the claimant has additional

limitations.").

Regulations also support the grids' application at the fifth step.  The introductory

language of the relevant regulation outlining "the grids" or vocational guidelines states:

(a) The following rules reflect the major functional and vocational patterns which
    are encountered in cases which cannot be evaluated on medical considerations

alone, where an individual with a severe medically determinable physical or mental impairment(s) is not engaging in substantial gainful activity and *the individual's impairment(s) prevents the performance of his or her vocationally relevant past work.*

Appendix 2 to subpart P of 20 C.F.R. Part 404—medical-vocational guidelines § 200.00(a) (emphasis added).  Thus, the language of the regulations and case law indicate that the grids are reserved for consideration at step five, or whether the claimant can perform other work that exists in the national economy consistent with the claimant's age, education, and work experience—a step that is only reached if the ALJ finds the claimant's impairments prevent her from performing her past relevant work.  *Id.* §§ 404.1520(a)(4), 416.920(a)(4); *see also Butler*, 353 F.3d at 997.

The Court concludes that ALJ Ray did not need to apply the grids.  First, ALJ Ray found that Ms. G.'s RFC was medium with some exertional limitations.  *See* AR 25–26.  Then, he stated that "[a]ccording to the vocational expert, the demands of her past relevant work, as actually and generally performed do not exceed the claimant's residual functional capacity."  AR 26.  That is because Ms. G.'s past relevant work was classified as light and sedentary work exertional levels—a classification Ms. G. does not appear to contest.  *See* AR 25–26.  If someone is found to be able to perform a "higher" classification level of work, it is assumed that they can perform lower level or levels.  *Valerio v. Comm'r of Soc. Sec.*, No. 5:14-cv-1457, 2016 WL 370701, at *12 n.14 (N.D.N.Y. Jan. 5, 2016), *report and recommendation adopted*, No. 5:14-cv-1457, 2016 WL 375124 (N.D.N.Y. Jan. 29, 2016) (citing 20 C.F.R. § 404.1567(b)–(e) ("[I]f someone can do medium work, the Commissioner determines that the claimant can also do all the exertional levels below.") (cleaned up).  Thus, since a medium RFC is "higher" than both a

light and sedentary RFC, the ALJ correctly concluded that Ms. G.'s medium RFC—even with limitations—could allow her to complete her light past relevant work.[8]

ALJs need not reach step five of the inquiry if they determine that the claimant could perform her past relevant work.  If an individual's claim fails at step four, the Commissioner will conclude that the individual is not disabled and deny the claimant's benefits request.  20 C.F.R. §§ 404.1520(a)(4) ("If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not go on to the next step."), 416.920(a)(4)(iv) ("If you can still do your past relevant work, we will find that you are not disabled.").  In other words, "[i]f [the claimant] can pursue h[er] former work, [s]he is not entitled to disability benefits."  *Davis*, 566 F. Supp. at 1196 (citing 20 C.F.R. § 404.1520(e)).  Because the ALJ concluded that Ms. G. could perform her past relevant work, he did not need to continue to step five.  Thus, the grids were not applicable to the present case and ALJ Ray did not err by not applying them.  His decision is affirmed on that issue.

## CONCLUSION AND ORDER

For these reasons, the Court **DENIES** Ms. G.'s Motion for Judgment of Reversal and **GRANTS** the Commissioner's Motion for Judgment of Affirmance.

Dated this May 20, 2024.

_____
ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE

---

[8] The ALJ would have found that Ms. G. could perform her past relevant work, even if he accepted Ms. G.'s argument that her RFC was light, because her past relevant work was classified as light or sedentary.